IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) ) |
| | MDL No. 2:18-mn-2873-RMG |
| | **This Document Relates to** *Hampton Bays Water District v. 3M Company et al*, **2:18-cv-03339-RMG** |

| | | |
|---|---|---|
| HAMPTON BAYS WATER DISTRICT, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| *-against -* | ) ) | |
| | ) | **SECOND AMENDED COMPLAINT** |
| 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., TYCO FIRE PRODUCTS L.P., CHEMGUARD, INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., E.I. DU PONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise; DYNAX CORPORATION; DUPONT DE NEMOURS, INC., f/k/a DowDuPont, Inc and CORTEVA, INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

Plaintiff, Hampton Bays Water District, by and through its attorneys Napoli Shkolnik PLLC, for its Second Amended Complaint against Defendants The 3M Company, f/k/a Minnesota Mining and Manufacturing Co., Buckeye Fire Equipment Company, Chemguard Inc., Tyco Fire Products L.P. and National Foam, Inc., E.I. Du Pont De Nemours and Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company FC, L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise, Dynax Corporation, DuPont de Nemours, Inc., (f/k/a DowDuPont, Inc.), and Corteva, Inc., and allege as follows:

## NATURE OF THE CASE

1.      This case involves New York's most precious natural resource – water.

2.      In 1978, the United States Environmental Protection Agency ("USEPA") designated the Long Island aquifer system as one of the first "sole source" aquifers in the country under the Safe Drinking Water Act, 42 U.S.C. §300h-3(e). A "sole source" aquifer is "an aquifer which is the sole or principal drinking water source for the area and which, if contaminated, would create a significant hazard to public health".

3.      The USEPA observed that "[s]ince contamination of ground-water aquifer can be difficult or impossible to reverse, contamination of the aquifer system underlying Nassau and Suffolk Counties, New York, would pose a significant hazard to those people dependent on the aquifer system for drinking purposes."

4.      Plaintiff Hampton Bays Water District ("HBW" or "Plaintiff") brings this action against The 3M Company, f/k/a Minnesota Mining and Manufacturing Co., Buckeye Fire Equipment Company, Chemguard Inc., Tyco Fire Products L.P. (successor in interest to Ansul

Co.) and National Foam, Inc., E.I. Du Pont De Nemours and Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company FC, L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise, Dynax Corporation, DuPont de Nemours, Inc., (f/k/a DowDuPont, Inc.), and Corteva, Inc. (collectively the "Defendants") to recover substantial past and future damages for the treatment and removal of the contamination of three (3) of its public drinking water supply wells by treating the water in those wells to eliminate contamination caused and/or created by Defendants' products, and to protect the public health, safety, welfare, and the environment.

5.      From the mid-1960's through today, Defendants manufactured, marketed, and sold aqueous film-forming foam ("AFFF"), a firefighting product used to control and extinguish aviation, marine, fuel, and other flammable liquid fires.

6.      Defendants' AFFF contained perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS"), and/or contains the precursors of PFOS and PFOA, and/or a wide variety of other closely related perfluorinated compounds ("PFCs") that behave in similar detrimental ways.

7.      Defendants' elected to include PFOA and/or PFOS in their AFFF knowing that groundwater contamination was foreseeable and imminent.

8.      PFOA and PFOS are toxic, do not biodegrade, are persistent in the environment, move readily through soil and the groundwater, and pose a significant risk to human health and safety.

9.      Defendants were aware in the 1960's and 1970's that PFOA and PFOS were toxic, do not biodegrade, are persistent in the environmental, move readily through soil and groundwater and pose a significant risk to the public water supply, human health and health and safety but elected to use these chemicals and place profits over human health.

10.     PFOA and PFOS are carcinogens associated with a variety of illnesses, including but not limited to kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia. The chemicals are particularly dangerous for pregnant women and young children.

11.     There is no safe level of PFOA and/or PFOS for humans to ingest.

12.     PFOA and PFOS have been classified as hazardous substances by the State of New York.

13.     Airports, military installations, and municipal fire departments were unaware of the environmental and health risks and hazards of using Defendants' AFFF-containing PFOA and PFOS for decades. These sites have been linked to the widespread contamination of surface and groundwater, as well as public drinking water wells, with PFOA, PFOS, and other perfluorinated chemicals ("PFCs") throughout the country.

14.     AFFF manufactured by the Defendants was used for civilian firefighting and firefighting training activities throughout Suffolk County, including within the capture zones of Plaintiff's supply wells.

15.     Defendants elected to include PFOA and/or PFOS and/or other PFCs in their AFFF formulations; there was no requirement to do so.

16.     On May 2, 2012, the United States Environmental Protection Agency's ("USEPA") published its Third Unregulated Contaminant Monitoring Rule ("UCMR3") which

required public water systems nationwide to monitor for thirty (30) contaminants of concern between 2013 and 2015.

17.     The UCMR3 Rule included the requirement that public water systems sample for six perfluorinated compounds ("PFCs"), including PFOA and PFOS.

18.     In October 2015, the USEPA released the results from UCMR3 which indicated the Plaintiff's raw water supply for Well 1-1 had a level of 41 parts per trillion ("ppt") from a sample taken on May 18, 2015.

19.     Prior to May 19, 2016, the USEPA's health advisory level for PFOS was 200 parts per billion ("ppb") and 400 ppb for PFOA.

20.     On May 9, 2016, the USEPA lowered the health advisory level to 70 ppt for PFOA and PFOS combined.

21.     As a result of the lowering of the EPA health advisory level, in May 2016, Hampton Bays took Well 1-1 off-line to ensure that the PFOA and PFOS levels stayed below the 70 ppt level.

22.     Well 1-1 has remained offline since May 2016 due to the PFOA and PFOS contamination.

23.     Due to the contamination of Well 1-1 and wanting to continue to protect the health of its customers, Plaintiff increased the monitoring of the other two supply wells located in Well Field 1, Wells 1-2 and 1-3.

24.     On July 14, 2017, Hampton Bays took Well 1-2 offline after sampling detected PFOA and PFOS in exceedance of the USEPA health advisory levels.  Well 1-2 has remained offline.

25.     Well 1-3 was removed from service in or about September of 2017 due to the PFOS and PFOA contamination, even through the levels had not exceeded 70 ppt.  Well 1-3 has remained offline.

26.     Additional testing confirmed PFOA and PFOS contamination in all three wells at Plaintiff's Well Field #1- Wells 1-1, 1-2, and 1-3.

27.     The most viable technologies to remove PFOS and PFOA (and other PFCs) from the groundwater are granulated activated carbon ("GAC"), reverse osmosis, and anion exchange.

28.     Plumes of PFOA and PFOS can persist in underground aquifers for many decades. Once the plume reaches a well, it continues to contaminate the water drawn from that well.

29.     Plaintiff currently has no treatment at Well Field 1 to treat the PFOS and PFOA contamination caused by Defendants.

30.     The cost of the water treatment should be borne by the polluters; not Hampton Bays or its customers.

31.     Hampton Bays has suffered significant injury and damages from the contamination of Wells 1-1, 1-2, and 1-3.

### THE PARTIES

### *Plaintiff*

32.     Plaintiff Hampton Bays is an improvement district in the Town of Southampton, New York. Plaintiff's mission is to pump, treat, store and distribute potable water for commercial and domestic use and fire protection to businesses, schools, municipal agencies, apartment complexes and private homes in the community.

33.    Plaintiff has the responsibility to install new services as needed, and to maintain the district's fire hydrants in good working order and maintains and repairs the water mains and water services of the district. Plaintiff maintains a level of water control with regular water sampling from the community for testing by a private laboratory. Plaintiff possesses inherent authority to perform acts to preserve or benefit its property and may maintain actions to recover damages to its property.

34.    Plaintiff has been operating for more than eighty years and serves in excess of 7,000 households and commercial establishments in the district. Plaintiff withdraws approximately one billion gallons of water per year from the aquifer.

35.    Plaintiff operates eleven (11) municipal supply wells, three (3) of which have been contaminated with PFCs. All of Plaintiff's supply wells are threatened by ever spreading PFC contamination of the sole source aquifer system from which it draws its potable water supply.

36.    In carrying out its powers, purposes and duties, Plaintiff is acting in all respects for the benefit of the people of the Hampton Bays Water District and the State of New York, for the improvement of their health, welfare and prosperity.

### *Defendants*

37.    Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized under the laws of the State Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

38.    Beginning before 1970 and until at least 2002, 3M manufactured, distributed and sold AFFF-containing PFCs that included but was not limited to PFOS.

39.    3M was the only company that manufactured or sold AFFF-containing PFOS.

40.    3M does business throughout the United States, including conducting business in New York. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

41.    Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business at One 1400 Pennbrook Parkway, Landsdale, Pennsylvania 19446. Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc; an Irish public limited company listed on the New York Stock Exchange [NYSE: JCI].

42.    Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990 (Ansul and Tyco (as the successor in interest to Ansul), will hereinafter be collectively referred to as "Tyco/Ansul.")

43.    Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFCs that included but was not limited to PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFCs that included but was not limited to PFOA.

44.    Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

45.    Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFCs that included but was not limited to PFOA.

46.    Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a foreign corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

47.    Defendant National Foam, Inc., (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 144 Junny Road, Angier, North Carolina 27501.

48.    DuPont Chemical Solutions Enterprise was a Delaware Corporation, with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

49.    DuPont Chemical Solutions Enterprise was a member of the Telomer Research Program ("TRP").  As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

50.    In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzenuiwski, DuPont Chemical Solutions Enterprise provided its Telomer-based sales products in the United States for the year 2002.

51.    The letter, which was redacted and sent to the EPA under its PFOA Stewardship Program, included Aqueous Firm Fighting Foam (AFFF) sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Services (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket[1].

52.    Defendant, E.I. Du Pont De Nemours & Co. ("DuPont"), successor in interest to DuPont Chemical Solutions Enterprises, is a Delaware Corporation and does business throughout the United States, including conducting business in New York.  Its principal place of business is 974 Centre Road, Wilmington Delaware 19805.

53.    Defendant Chemours Company, successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware Corporation and conducts business throughout the United

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621.

States, including conducting business in New York. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

54.     Defendant the Chemours Company FC, L.L.C., successor in interest to DuPont Chemical Enterprise, is a Delaware Corporation and conducts business throughout the United States including conducting business in New York. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899.

55.     Defendant Dynax Corporation is a Delaware Corporation that conducts business throughout the United States, including business in New York. Its principal place of business is 103 Fairview Park Drive Elmsford, New York, 10523-1544.

56.     In 1991, Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

57.     Defendant DuPont de Nemours, Inc., (f/k/a DowDuPont, Inc.) is a Delaware Corporation that conducts business throughout the United States, including business in New York. Its principal place of business is 1999 Bryan St. 900 Dallas, TX.

58.     Defendant Corteva, Inc. is a Delaware Corporation that conduct business in the United States, including business in New York. Its principal place of business is 974 Centre Rd, Wilmington, DE 19805.

59.     At all times relevant to this litigation, Defendants did business in New York as distributors, suppliers, sellers and/or marketers of AFFF containing PFOA and PFOS.

60.     At all times relevant to this litigation, Defendants engaged in one or more phases of the AFFF, including but not limited to the distribution, transportation, supply, sale and/or marketing of AFFF containing PFOA and PFOS.

61.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

62.     When the term "Defendants" is used alone, it refers to all Defendants jointly. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## JURISDICTION AND VENUE

63.     Defendants are subject to the jurisdiction of this Court pursuant to New York Civil Practice Laws and Rules 301 and/or 302.

64.     This Court is the proper venue for this case pursuant to CPLR §503 because a substantial part of the events or omissions giving rise to claim occurred in the County of Suffolk.

65.     This Court has personal jurisdiction over defendants as they do business in New York such that it is reasonably foreseeable that they would be subject to the jurisdiction of the Courts of this State.

66.     Plaintiff brings causes of action based solely on and arising under New York law. The claims of Plaintiff are for violations of New York law that occurred exclusively in the State of New York.

## FACTUAL ALLEGATIONS

### A. PFOA, PFOS and the Treats They Pose to Public Health and the Environment.

67.     Poly- and perfluoroalkyl substances are terms used to describe a group of organic fluorinated alkanes. These compounds have been used for decades to produce household and

commercial products that are heat resistant, stain resistant, long lasting, and water and oil repellant. The substances are not naturally occurring and must be manufactured.

68.     The two most widely studied types of these substances are PFOA and PFOS which each contain eight carbon atoms.

69.     PFOS and PFOA have unique characteristics that cause them to be: (i) mobile and persistent, meaning they do not stick to soil and are readily transported through the soil and into groundwater where they can migrate long distances; (ii) bio accumulative and biomagnifying, meaning they tend to accumulate in organisms and up the food chain; and (iii) Toxic, meaning they pose serious health risks to humans and animals. Because of these properties, PFOA and PFOS pose significant threats to public health and the environment.

70.     PFOA and PFOS easily dissolve in water, and thus they are mobile and readily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into the groundwater, where they can travel significant distances.

71.     PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically and biologically stable and they resist degradation due to light, water, and biological process.

72.     Bioaccumulation occurs when an organism absorbs a substance at a faster rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

73.     PFOA and PFOS bio accumulate/biomagnify in numerous ways. First, they are relatively stable and once ingested, they bio accumulate in individual organisms for significant

periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

74.    Also, in humans and other mammals, PFOA and PFOS can bio accumulate by crossing the placenta from mother to fetus and by passing to infants through breast milk.

75.    Finally, PFOA and PFOS biomagnify up the food chain, such as when humans eat fish that have ingested PFOA or PFOS.

76.    Studies have shown that exposure to fluorochemicals that contain eight carbons or more ("C8"), such as PFOS and PFOA, may cause testicular cancer, kidney cancer, and liver damage in adults, as well as developmental effects to fetuses during pregnancy or to breast-fed infants, including low birth weight, accelerated puberty, and skeletal variations.

77.    There have also been studies linking C8s with autoimmune and endocrine disorders, elevated cholesterol, increased liver enzymes, decreased vaccination response, thyroid disease, and pregnancy-induced hypertension and preeclampsia (a serious pregnancy complication). These injuries may arise within months or years after exposure to PFOS or PFOA.

**B. Defendants' Development of AFFF Products Containing PFOA/S.**

78.    In the 1940s, 3M began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFOA and PFOS. 3M soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotchguard, which contained PFOS and when applied to fabric, furniture, and carpets, protected against liquids and stains.

79.    In the 1960's, 3M began developing firefighting foams containing PFOS to suppress flammable liquid fires, which cannot be effectively extinguished with water alone.

80.    AFFF does not confront the same problems that water alone does in extinguishing flammable liquid fires. AFFF concentrate containing PFOA or PFOS forms foam when it is mixed with water and ejected from a nozzle. That foam is then sprayed so that it coats the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

**C. Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFOA and PFOS.**

81.    By at least the end of the 1960s, animal toxicity testing performed by 3M and DuPont Chemical Solutions Enterprise indicated that exposure to such materials, including at least PFOA, resulted in various adverse health effects amount multiple species of laboratory animals, including toxic effects to the liver, testes, adrenals and other organs and bodily systems.

82.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont Chemical Solutions Enterprise indicated that such materials, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

83.    By at least the end of the 1970s, additional research and testing performed by 3M and DuPont Chemical Solutions Enterprise indicated that one or more such materials, including at least PFOA and PFOS, because of their unique chemical structure, would bind to proteins in the blood of animals and humans exposed to such materials would not only remain and persist over long periods of time but would accumulate and build up in the blood/body of the exposed individuals with each additional exposure, no matter how small.

84.    On information and belief, by at least the 1970s 3M and DuPont Chemical Solutions Enterprise knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

85.    Upon information and belief, 3M and DuPont Chemical Solutions Enterprise concealed from the public and government agencies its knowledge of the risk of harm posed by PFOA/S.

86.    In 1975, 3M concluded that PFOS was present in the blood of the general population. Since PFOA/S in not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS. The finding also should have alerted 3M to the possibility that PFOS might be mobile, persisted, bioaccumulative, and biomagnifying, as those characteristics could explain the absorption of PFOS in the blood from 3M's products.

87.    In 1976, 3M found PFOA was persistent in the blood of its workers. This should have alerted 3M to the same issue raised by findings regarding PFOS in the prior year.

88.    3M communicated its findings to DuPont Chemical Solutions.  Both chose not to disclose this information to regulators.

89.    A 1978 study by 3M showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies that year showed that PFOS and PFOAS were toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

90.    Studies by 3M after the 1970s also showed adverse effects from exposure to PFOA and PFOS.

91.    In a 1983 study, 3M found that PFOS caused the growth of cancerous tumors in rats.

92.     A study proposal by 3M in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE &PC), Fate of Fluorochemicals- Phase II at p.6 (E.A. Reiner, ed. May 20, 1983).

93.     By at least the end of the 1980s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M and DuPont Chemical Solutions Enterprise, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

94.     By at least the end of the 1980s, Defendants, including at least 3M and DuPont Chemical Solutions Enterprise, understood that, not only did these PFAS materials, including at least PFOA and PFOS, get into and persist and accumulate in human blood and in the human body, but that once in the human body and blood, particularly the longer-chain PFAS materials, such as PFOS and PFOA, had a long half-life, meaning that they would take a very long time (years) before even half of the material would start to be eliminated (assuming no further exposure), which allowed increasing levels of the chemicals to build up and accumulate in the blood and/or body of the exposed individuals over time, particularly if any level of exposures continued.

95.     In 1991 Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

96.    By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M, DuPont Chemical Solutions Enterprise and Dynax Corporation, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors ( Leydig cell (testicular), liver and pancreatic) in a second chronic cancer study in rats.

97.    In its amendments to the Polymer Exemption Rule in 1995,the EPA added PFAS chemicals, those containing halogen compounds, because the information provided to the EPA by the manufacturers indicated that PFAS were environmentally stable and would not present an unreasonable  risk to human health and the environment.

98.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its ingredients as Water, PFOA and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted by 3M and DuPont" as support for this statement. 3M's MSDSs for AFFF did not provide similar warnings.

99.    In 2001 AFFF manufacturers such as DuPont and Dynax Corporation formed the Fire Fighting Foam Coalition.

100.    The Fire Fighting Coalition made presentations to the EPA and various branches of the military stating and reassuring that the chemical used to replace PFOS were safe for human health and the environment and AFFF was the only way to safely protect military personnel from fires.

101.    On information and belief, all defendants knew or should have known that in its intended and/or common use, AFFF containing PFAS would very likely injure and/or threaten public health and the environment.

102.    On information and belief, this knowledge was accessible to all defendants.

103.    On information and belief, all defendants knew or should have known that their AFFF products and the PFAS the products contained, easily dissolved in water, as they were designed to be mixed with water; are mobile, as they were designed to quickly form a thin film; resist degradation and have long shelf life, since that is the nature of the products chemical composition, and tend to bio-accumulate, as their carbon-fluorine bonds are very strong and take years to decompose.

104.    Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substances or mixture presents a substantial risk of injury to health or the environment." See Toxic Substance Control Act ("TSCA") §8 (e), 15 U.S.C. §2607 (e).

105.    3M did not comply with its duties under TSCA, and in April 2006 it agreed to pay EPA a penalty of more than $1.5 million for its failure to disclose studies regarding PFOA/S and other per-fluoroalkyl substances dating back decades, among other things.

106.    DuPont did not comply with TSCA and the Resource Conservation and Recovery Act (RCRA), and in 2005 agreed to pay $10.25 million, the largest civil administrative penalty EPA had ever obtained to that date under any federal statute.  The TSCA violations of Section 8(e) specifically addressed the company's failure to report to the EPA the substantial risks of PFOA.

107.    On January 25, 2006 EPA administrator Stephen L. Johnson invited eight major PFOA manufacturers to participate in a global stewardship program, asking them to reduce PFOA emissions by 95% by 210 and end all use by 2015.

108.    On March 7, 2006 the EPA issued a proposed rule to amend the Polymer Exemption Rule, stating that based on new information it had learned it could no longer make the determination that PFAS will not present unreasonable risk to human health or the environment.  And further, that PFAS have a high level of toxicity and have shown liver, developmental, and reproductive toxicity at very low dose levels in laboratory animals.

**D. AFFF Containing PFOA and PFOS Is Fungible and Commingled in the Groundwater.**

109.    AFFF containing PFOA and/or PFOS, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF.

110.    The process of manufacture and distribution of AFFF, including that which contains PFOA and/or PFOS, sometimes includes complex arrangements whereby Defendants sell product for delivery through specific fire departments, associations, training facilities and/or third-party logistic intermediaries throughout the country.

111.    A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF coming from different manufacturers.

112.    The case here is typical: even though a couple of areas were located around Well Field #1 (such as the transfer station where firefighting exercises were historically conducted) where AFFF was used and entered the groundwater, state investigators could not determine the identity of the manufacturers whose AFFF containing PFOA and PFOS contributed to the groundwater contamination plume impacting Plaintiff's Wells 1-1, 1-2 or 1-3.

113.    Because precise identification of the specific manufacture of any given AFFF that was the source of PFOA and PFOS found in Plaintiff's Wells is impossible, Plaintiff must pursue

all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiff.

114.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF containing PFOA and PFOS, at Plaintiff's expense, to contaminate Plaintiff's water supply, and to attempt to avoid liability for such contamination of the groundwater.

### E. Evolving Understanding of the Levels of Acceptably Safe Exposure to PFOA/S

115.    As previously stated, neither 3M, DuPont, Dynax Corporation nor, on information and belief, the other Defendants, complied with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF products containing PFOA and PFOS See TSCA § 8(e).

116.    In or around 1998, EPA began investigating the safety of PFOA and PFOS after some limited disclosure by 3M and others.

117.    As the EPA learned more about PFOA and PFOS, their recommendations in the Health Advisory evolved.

118.    On January 8, 2009 EPA issued a Provisional Health Advisory for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. Provisional Heal Advisories for Perfluorooctanoic Acid (PFOA) and Perfluoroctane Sulfonate (PFOS), available at http:/ /www.epa.gov /sites/productionfiles/ 20150-9/documents/pfoa-pfos-provisional.pdf, at p.1, n.1 ( last visited January 2019).

119.    On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA

and PFOS, either singly or combined, should not exceed 70 ppt. See Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33,250-51 (May 25, 2016).

120.    The EPA issued a subsequent clarification of this update on November 16, 2016.

**F. Market Share Liability, Alternative Liability, Concert of Action, Enterprise Liability.**

121.    Defendants in this action are manufacturers that control a substantial share of the market for AFFF-containing PFOA and/or PFOS in the United States and are jointly responsible for the contamination of Plaintiff's groundwater supply and for causing the damages and injuries complained of in this Complaint.

122.    Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF-containing PFOA and/or PFOS at issue in this Complaint.  PFOA and PFOS is fungible; it is impossible to identify the exact Defendant who manufactured any given batch of AFFF containing PFOA and/or PFOS found free in the groundwater, and, each of these Defendants participated in a state-wide and national market for AFFF containing PFOA and/or PFOS during the relevant time.

123.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF-containing PFOA and/or PFOS.

124.    Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

**G. Conspiracy.**

125.    Defendants actually knew of the health and environmental hazards which PFOA and PFOS posed to Plaintiff and other public water suppliers.

126.    Beginning in the 1970's and continuing through the date of this Complaint, Defendants formed joint task forces and committees and otherwise colluded for the avowed purpose of providing information about AFFF-containing PFOA and/or PFOS to the public and to government agencies, but with the true, unlawful purpose of:

    a.  Creating a market for AFFF-containing PFOA and/or PFOS despite knowledge of the hazards which PFOA and PFOS posed to the groundwater in New York and the residents who depend on such water;

    b.  Concealing the environmental properties and toxic nature of PFOA and PFOS, and its impact on Plaintiff and other water suppliers; and

    c.  Maximizing profits in a way Defendants knew would require them to contaminate the groundwater of the nation, including Plaintiff's water supply.

127.    Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

    a.  Intentionally misrepresenting to the USEPA, its customers, and the public that AFFF-containing PFOA and/or PFOS was safe and did not pose an environmental or human health risk;

    b.  Concealing the dangers of PFOA and PFOS (including toxicological information on the dangers of the chemicals to living organisms, adverse fate and transport characteristics and the propensity of PFOA and PFOS to contaminate groundwater) from the USEPA, its customers, and the public by, among other means, repeatedly requesting that information about the dangers and health effects of PFOA and PFOS be suppressed and not otherwise published and by downplaying any adverse findings relating to PFOA and PFOS;

    c.  Concealing the dangers of AFFF-containing PFOA and/or PFOS from its users, sensitive receptors and other public water suppliers, such as Plaintiff;

    d.  Using their considerable resources to fight PFOA and PFOS regulation; and

e.  Collectively deciding to use PFOA and/or PFOS rather than other, safer surfactants because AFFF-containing PFOA and/or PFOS was the most profitable surfactant for Defendants to use.

128.    As a direct and proximate result of the Defendants' above described conspiracy, PFOA and PFOS has contaminated Plaintiff's Supply Wells 1-1, 1-2 and 1-3, which requires significant, expensive, and long-lasting treatment.

## COUNT I
## STRICT LIABILITY – DESIGN DEFECT AND/OR DEFECTIVE PRODUCT

129.    Plaintiff realleges each of the preceding paragraphs and incorporates each such paragraphs as if fully stated herein.

130.    As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of AFFF containing PFOA and PFOS, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

131.    Defendants knew that third parties would purchase AFFF containing PFOA and PFOS and use it without inspection for defects.

132.    AFFF containing PFOA/PFOS purchased or otherwise acquired (directly or indirectly) from Defendants by third parties were applied, discharged, disposed of, or otherwise released onto lands and/or water in the vicinity of Plaintiff's water production wells. Such discharges occurred at various locations, at various times, and in various amounts.

133.    The AFFF containing PFOA/PFOS purchased by third parties was used in a reasonably foreseeable manner and without substantial change in the condition of such products.

134.    Defendants knew or reasonably should have known that the use of AFFF containing PFOA and PFOS in its intended manner would foreseeably result in the spillage, discharge, disposal, or release of AFFF onto land or into groundwater.

135.    The AFFF containing PFOA and PFOS used in the vicinity of Plaintiff's water production wells was defective in design and unreasonably dangerous because, among other things:

    a.    PFOA and PFOS causes extensive and persistent groundwater contamination when it, or products containing it, are used in their foreseeable and intended manner.

    b.    PFOA and PFOS contamination in drinking water poses significant threats to public health and welfare.

    c.    Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFOA and PFOS.

136.    At all times relevant to this action, AFFF containing PFOA and PFOS was dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the foreseeable risk of harm to public health and welfare posed by PFOA and PFOS outweighed the cost to Defendants of reducing or eliminating such risk.

137.    Defendants knew or should have known about feasible alternatives to producing AFFF without the use of PFOA and PFOS, and the omission of such alternative designs rendered AFFF not reasonably safe.

138.    As a direct and proximate result of the defects previously described, Plaintiff's supply wells have been, and continue to be, contaminated with PFOA/PFOS in varying amounts over time, causing Plaintiff significant injury and damage.

139.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA/PFOS contamination of its wells in an amount to be proved at trial.

140.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of

groundwater. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

141.    Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT II
## STRICT LIABILITY- FAILURE TO WARN

142.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

143.    As commercial distributors, sellers, manufacturers, suppliers, marketers, and/or designers of AFFF, Defendants had a strict duty to warn against latent dangers resulting from foreseeable uses of the product that Defendants knew or should have known about.

144.    Defendants knew that third parties would purchase AFFF containing PFOA and PFOS and use it without inspection for defects.

145.    AFFF containing PFOA/PFOS purchased or otherwise acquired (directly or indirectly) from Defendants by third parties was applied, discharged, disposed of, or otherwise released at various locations, at various times, and in various amounts onto the lands and/or water in the vicinity of Plaintiff's drinking water production wells.

146.    The AFFF containing PFOA and PFOS purchased by third parties was used in a reasonably foreseeable manner and without substantial change in the condition of such products.

147.    Defendants knew or should have known that the use of AFFF containing PFOA/PFOS in its intended manner would result in the discharge, disposal, or release of PFOA/PFOS onto land and into groundwater.

148.    The AFFF containing PFOA and PFOS used in the vicinity of Plaintiff's Well Field #1 was defective in design and unreasonably dangerous products for the reasons set forth above.

149.    Despite the known and/or reasonably foreseeable hazards to human health and welfare associated with the use of AFFF containing PFOA and PFOS in the vicinity of Plaintiff's water production wells, including contamination of public drinking water wells with PFOA/PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

150.    In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their AFFF products containing PFOA/PFOS or otherwise.

151.    As a direct and proximate result of Defendants' failure to warn of the hazards posed by disposal or release of AFFF containing PFOA/PFOS in the vicinity of subterranean public drinking water wells that were, or reasonably should have been, known to them, PFOA and/or PFOS contaminated Plaintiff's supply wells.

152.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and/or PFOS contamination of its wells in an amount to be proved at trial.

153.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of

water supply wells. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

154.     Defendants are strictly, jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT III
## NEGLIGENCE

155.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

156.     As commercial distributers, sellers, manufacturers, suppliers, marketers, and/or designers, Defendants owed a duty of care to Plaintiff not to place into the stream of commerce a product, AFFF, that was in a defective condition and unreasonably dangerous to groundwater.

157.     Defendants breached this duty by negligently designing, formulating, manufacturing, distributing, selling, supplying, and/or marketing such unreasonably dangerous products into the stream of commerce, including in Suffolk County, even when they knew or should have known of the dangers PFOA and PFOS posed to public drinking water wells.

158.     Among other things, Defendants breached this duty when they manufactured, marketed, distributed, supplied, and sold AFFF even though they knew or should have known of the dangers that PFOA and PFOS posed to groundwater. Defendants should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFAS

compounds, like PFOS and PFOA, would result in the contamination of the public supply water wells, including Plaintiff's Well Field #1.

159.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and to human health.

160.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of its Supply Wells 1-1, 1-2 and 1-3 in an amount to be proved at trial.

161.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of public groundwater supply wells. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

162.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT IV
## PUBLIC NUISANCE

163.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

164.    Plaintiff provides drinking water to its residents to from its groundwater supply wells that is used for drinking, bathing, cleaning, washing, cooking, water vegetables, and other uses.

165.    Because Plaintiff is a public entity, the water it provides to its residential and commercial customers is a public and commonly held resource.  Members of the public have a right to have their water remain clean, safe, and free of Defendants' toxic contamination.

166.    Defendants' acts and omissions, including their manufacture, sale, supply, marketing, and defective design of, and/or failure to warn regarding PFOA and/or PFOS in AFFF contaminated Plaintiff's wells, rendering water served from them unfit for human consumption and a public health hazard.

167.    Consequently, Defendants substantially interfered with and caused damage to a public or common resource that endangered public property, as well as the health, safety, and comfort of a considerable number of persons. Such action creates, contributes to, or maintains a public nuisance.

168.    As an owner of water production wells and purveyor of drinking water, Plaintiff suffers injuries different in kind from the community at large because it relies entirely upon its water production wells for its public service functions.

169.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of the groundwater supply. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

170.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT V
## PRIVATE NUISANCE

171.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

172.    Plaintiff is the owner of land, easements, and water rights that permit it to extract groundwater for use in its wells to provide drinking water to its customers.

173.    Defendants' intentional, negligent, and/or reckless conduct, as alleged herein, has resulted in substantial contamination of Plaintiff's supply Wells 1-1, 1-2 and 1-3 by PFOA and PFOS, human carcinogens that cause adverse human health effects and render water undrinkable.

174.    Defendants' manufacture, distribution, sale, supply, and marketing of AFFF containing PFOA/PFOS was unreasonable because Defendants had knowledge of PFOA and PFOS's unique and dangerous chemical properties and knew that contamination of public groundwater supply wells was substantially certain to occur, but failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

175.    The contamination caused, contributed to, and/or maintained by Defendants substantially and unreasonably interferes with Plaintiff's property rights to appropriate, use, and enjoy water from its wells in Well Field #1.

176.    Each defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

177.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFOA and PFOS contamination of Wells 1-1, 1-2, and 1-3 in an amount to be proved at trial.

178.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of Plaintiff's groundwater supply. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

179.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT VI
## TRESPASS

180.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

181.    Plaintiff owns and possesses its drinking water production system, including drinking water production wells that extract groundwater in Suffolk County, New York.

182.    Plaintiff actually and actively exercises its rights to appropriate and use groundwater drawn from its wells, including from Well Field #1.

183.    Plaintiff did not give any Defendant permission to cause PFOA or PFOS to enter its groundwater wells.

184.    Defendants knew or reasonably should have known that:

    a.  PFOA and PFOS have a propensity to infiltrate groundwater aquifers when released to the environment;

    b.  PFOA and PFOS are mobile and persistent groundwater contaminants capable of moving substantial distances within aquifers;

    c.  They are toxic to human health; and

    d.  They are therefore hazardous to public water systems and human health and welfare.

185.   Defendants manufactured, promoted, marketed, distributed, and/or sold AFFF containing PFOA and PFOS, which Defendants knew or reasonably should have known would virtually certainly be discharged and release toxic PFOA and PFOS into the ground and intrude upon, contaminate, and damage Plaintiff's possessory interest.

186.   Defendants' willful conduct directly resulted in the placement of its product, AFFF, on and in property owned by Plaintiff without permission or right of entry.

187.   Each Defendant is a substantial factor in bringing about the contamination of Plaintiff's wells, and each Defendant aided and abetted the trespasses and is jointly responsible for the injuries and damage caused to Plaintiff.

188.   As a direct and proximate result of Defendants' acts and omissions resulting in PFOA and PFOS entering Plaintiff's Water wells 1-1, 1-2 and 1-3, Plaintiff sustained actual injuries and damages related to the PFOA and/or PFOS contamination of its wells in an amount to be proved at trial.

189.   Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFOA and PFOS contamination of the public groundwater supply. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of AFFF, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

190.    Defendants are jointly and severally liable for all such damages, and Plaintiff is entitled to recover all such damages and other relief as set forth below.

## COUNT VII
## MARKET SHARE LIABLITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABLITY

191.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

192.    Defendants in this action are manufactures, distributors, sellers, suppliers and marketers of AFFF containing PFOA/PFOS that control a substantial share of the market for AFFF in New York and are jointly responsible for the increased threat to groundwater in New York and for causing the injuries complained of in this Complaint.

193.    Advances in science and technology have allowed Defendants to create a fungible good that has been shown to harm Plaintiff and its customers and which cannot be traced to any specific producer.

194.    Market share liability attaches to all Defendants and that liability of each should be assigned according to its percentage of the market for AFFF in New York at issue in this Complaint.

195.    AFFF containing PFOS and PFOS is fungible once it is in the groundwater.  It is impossible to identify the exact commercial entity that manufactured any given batch of PFOS and/or PFOA found free in the environment; and, each of these Defendants participated in a state-wide and national market for AFFF containing PFOA and PFOS during the relevant time in Long Island, New York.

196.    Concert of action liability attaches to Defendants each of which participated in a common plan to commit the intentional torts alleged herein and each of which acted tortiously in pursuance of the common plan.

197.    Defendants in this action acted in concert to transport, distribute, supply, sell and/or market AFFF containing PFOA and PFOS as a safe and effective product for use by the public.

198.    Enterprise liability attaches to the named Defendants. There are no limitations on liability as set forth in CPLR 1602 applicable to this action in that one or more of the exceptions set forth in CPLR 1602 apply, including subsections (5) and/or (11).

199.    Because Defendants acted with malice in their conscious, willful, and wanton disregard of the probable dangerous consequences of their conduct and its foreseeable impact upon the Plaintiff, Plaintiff is entitled to punitive damages.

## COUNT VIII
## VIOLATION OF THE NEW YORK UNIFORM FRAUDULENT CONVEYANCE ACT
### (E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)

200.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

201.    Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent Conveyance Act (UFCA) as adopted by the State of New York, against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively the UFCA Defendants). C.R.S. NY CLS Dr & Cr, Art 10 §§270-281.

202.    Under the UFCA: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NY CLS Dr & Cr §273. "Every conveyance made without fair consideration

when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." NY CLS Dr & Cr §273-a. "Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." NY CLS Dr & Cr §274. "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." NY CLS Dr & Cr §275. "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." NY CLS Dr & Cr §276.

203.    The UFCA Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

204.    UFCA Defendants engaged in acts in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of parties such as Plaintiffs that have

been damaged as a result of the UFCA Defendants' conduct, omissions, and actions described in this Complaint.

205.    It is primarily E. I. DuPont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF containing PFAS and PFAS for use in AFFF with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate the Plaintiff's drinking water supply and injure the Plaintiffs.

206.    As a result of the transfer of assets and liabilities described in this Complaint, the UFCA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and PFAS for use in AFFF.

207.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. DuPont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

208.    The UFCA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. DuPont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

209.    At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

210.    Pursuant to C.R.S. NY CLS Dr & Cr, Art 10 §§270-281,   Plaintiffs seek avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to the UFCA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

211.    Plaintiffs further seek all other rights and remedies that may be available to it under UFTA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiffs for the damages and injuries they have suffered as alleged in this Complaint.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment against these Defendants for:

1.    Plaintiff is not asking for any equitable or injunctive relief, but compensatory damages only;

2.    Compensatory damages in an amount to be demonstrated and proven at trial but which is:

    a.    Above the jurisdictional minimum of this court on the First Cause of Action;

    b.    Above the jurisdictional minimum of this court on the Second Cause of Action;

    c.    Above the jurisdictional minimum of this court on the Third Cause of Action; and

    d.    Above the jurisdictional minimum of this court on the Fourth Cause of Action;

    e.    Above the jurisdictional minimum of this court on the Fifth Cause of Action;

    f.    Above the jurisdictional minimum of this court on the Sixth Cause of Action; and

    g.    Above the jurisdictional minimum of this court on the Seventh Cause of

Action;

3.     Punitive damages in an amount to be determined at trial;

4.     Interest on the damages according to law;

5.     Costs, disbursements and attorneys' fees of this lawsuit; and

6.     Any other and further relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated:  New York, New York
       March 17, 2020

                            **NAPOLI SHKOLNIK PLLC**

                            */s/ Paul J. Napoli*
                            Paul J. Napoli
                            Patrick J. Lanciotti
                            360 Lexington Avenue, Eleventh Floor
                            New York, NY 10017
                            Telephone: (212) 397-1000
                            E-mail: pnapoli@napolilaw.com
                            E-mail: planciotti@napolilaw.com